UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY CROSSON,

    Plaintiff,                                       Case No. 17-cv-12361

vs.                                                       HON. MARK A. GOLDSMITH

UNITED STEEL LOCAL 1299, et al.,

    Defendants.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkts. 41, 42)**

This matter is now before the Court on motions for summary judgment filed by Defendants United Steel International Union and United Steel Local 1299's (the "Union") (Dkt. 41) and Defendant United States Steel Corporation ("U.S. Steel") (Dkt. 42). Both motions have been fully briefed. Because oral argument will not aid the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons that follow, the Court grants Defendants' motions for summary judgment and dismisses the case.

## I.     BACKGROUND

Plaintiff Terry Crosson worked as a ladleman at U.S. Steel. U.S. Steel's Mot. for Summ. J., Statement of Material Facts ("SMF"), ¶¶ 1-2 (Dkt. 42). Crosson was represented during his employment by United Steel Local 1299. Id. Crosson's responsibility was to open and close a ladle which poured molten steel into a mold. Id. ¶ 3. A full ladle holds approximately 250 tons of liquid steel at a temperature of 2800 degrees. Id. Once the ladle is full, and the crane in which the ladle is set has been unhooked, a ladleman presses a button that initiates the process of

rotating the full ladle so that it pours the liquid steel into the mold.  Id. ¶¶ 4-5.

On October 23, 2016, Crosson pressed the button before the crane was unhooked from the full ladle.  Id. ¶ 20.  In order to do this, Crosson needed to lift the plastic cover over the control button, then hit the button.  Id.  Crosson testified that he hit both the "stop" and "E-stop" buttons immediately afterwards.  Crosson Dep. Tr., Ex. U to Def. U.S. Steel Mot., at 55-56, 60-61 (Dkt. 42-22).[1]  If Crosson had not hit the E-stop button within ten seconds, a failure of the crane or turret would have been inevitable.  SMF ¶ 24.  Several Union and U.S. Steel employees, familiar with the industry, offered their common-sense opinions regarding the catastrophic consequences that could have resulted.  Raymond Slumpff, Labor Relations Counselor at U.S. Steel, testified that "[i]t's obvious if you have 250 tons of molten iron that is jostling around in a ladle that there's going to be somebody hurt because there's people all over the place," Slumpff Dep. Tr., Ex. W to U.S. Steel Mot., at 12 (Dkt. 42-24), and "there could have been the potential for death and company equipment damage," id. at 42.  David Mullins, U.S. Steel's Shift Manager and Foreman, agreed that "[i]f you're spilling liquid metal . . . that's at 2,800 degrees, yeah, sure," that could kill or injure people.  Mullins Dep. Tr., Ex. V to U.S. Steel Mot., at 28 (Dkt. 42-23).  Hawley Warren, the Union Grievance Vice Chairman, testified that "[o]nce he hit that button[,] if it hadn't been stopped there was a huge potential for people to be killed and a significant amount of damage."  Warren Dep. Tr., Ex. D to Pl. Resp. to U.S. Steel Mot., at 83 (Dkt. 43-5).  Nonetheless, it is undisputed that U.S. Steel did not suffer any property damage or production loss as a result of Crosson's actions.

At the time of the incident, Mullins was supervising Crosson's department.  SMF ¶ 26;

---

[1] The parties dispute whether the ladle actually moved before Crosson was able to hit the E-stop button; the Union points to an Employee Activity Report that said the ladle moved about a foot, Ex. K to Def. U.S. Steel Mot. (Dkt. 42-12); Crosson maintains that the ladle is too big and too heavy to start moving right away, so there is a "lag," Crosson Dep. Tr. at 59-60.

Plaintiff's SMF ¶ 28 (Dkt. 44). After hearing a woman say "stop" over the radio, Mullins called his supervisor, Area Manager Paul Miller; Miller told Mullins to find out what had happened. SMF ¶ 26. All parties agree that Mullins spoke with Crosson, though there is a dispute about what occurred during this conversation. Crosson testified that he told Mullins what had happened, and Mullins told him that he would "put this down as a safety contact. . . . Nothing is going to come out of it." Crosson Dep. Tr. at 65. Mullins denied that he told Crosson that "the most would happen would be a safety contact," because he had no idea what Crosson's punishment would be at that point. Mullins Dep. Tr. at 17.

The following day, Crosson was issued two five-day suspensions: the first for "committ[ing] an unsafe act with a catastrophic potential outcome," and the second for "unsatisfactory work performance." SMF ¶ 32. Crosson contacted the Union to dispute his discipline. Id. ¶ 33. On October 26, 2016, a 9(b) hearing was held. Id. The 9(b) hearing is intended to be a "fact finding" opportunity before a final disciplinary decision is made. Id. Crosson, two union representatives, and three U.S. Steel employees, including Miller and Slumpff, attended the hearing. Id. Crosson stated that he "immediately realized I made a mistake. I have no B.S. to give you." Id. ¶ 36.

On November 3, 2016, Slumpff converted Crosson's suspensions into a discharge. See Great Lakes Notification of Discipline Status, Ex. O to U.S. Steel Mot. (Dkt. 42-16); Great Lakes Notification of Discipline Status, Ex. P to U.S. Steel Mot. (Dkt. 42-17). Slumpff testified that there was proper cause to terminate Crosson because "someone could have been killed." Slumpff Dep. Tr. at 16. Prior to this incident, Crosson did not have any safety-related discipline in his record. See Second Step Minutes, Ex. 6 to Union Mot., at U000134 (Dkt. 41-7).

On November 4, 2016, Crosson filed a grievance challenging U.S. Steel's decision to

3

convert his suspension to a discharge. SMF ¶ 54. U.S. Steel and the Union held a "Second Step" meeting on December 13, 2016; this meeting was attended by Slumpff for U.S. Steel and one union representative, Wheeler Marsee. Id. ¶ 55. Marsee acknowledged that Crosson "made a bad judgement" and "could have killed people," but also stated that there were no injuries or damages, and that he believed Crosson had learned from his mistake. 12/13/2016 Notes, Ex. R to U.S. Steel Mot., at PageID.1009 (Dkt. 42-19). U.S. Steel again denied the grievance.

On March 2, 2017, a "Step 3" meeting was held to discuss Crosson's discharge.[2] SMF ¶ 58. Crosson attended this meeting, as did U.S. Steel Labor Relations Director Jennifer Hickey, Union President Jim Allen, and Union Grievance Vice Chairman Hawley Warren. Id. Allen argued that discharge was too severe a penalty for Crosson's actions. Crosson Dep. Tr. at 112. After the meeting, Hickey denied Crosson's grievance. Hickey Dep. Tr., Ex. X to U.S. Steel Mot., at 59 (Dkt. 42-25). Union representatives Allen, Warren, and Union Staff Representative Kevin Mapp met to determine whether to advance Crosson's claim to arbitration. SMF ¶ 60. They unanimously decided not to take the case to arbitration because they did not think that they would win. Id. Allen testified that he did not think the punishment was too severe, due to "the potential to kill people" when "you make a mistake like that where you could put that much steel

---

[2] Crosson contends that by taking his grievance to Step 3, the Union was taking the position that U.S. Steel did not have proper cause to terminate him. He cites testimony from Warren, who was asked whether "the union [is] taking the position that U.S. Steel does not have proper cause to terminate the Grievant" when it "decides to take a matter to Step Three." Warren Dep. Tr. at 34. Warren responded, "More often than not, yes. Sometimes, honestly, we know that we have nothing. So I mean, but we take everything to Third Step on the discharge. . . . The argument is always that there's no proper cause." Id. at 34-35. Union President Jim Allen also testified that it was "almost automatic" that the Union appeals to Step Two, but agreed that it is "not a matter of course to go to step three[.]" James Allen Dep. Tr., Ex. Y to U.S. Steel Mot., at 60 (Dkt. 42-26). He further stated, "All I know is that Wheeler [Marsee] makes it a habit to appeal every grievance to third step." Id. at 61. Allen denied that by taking the matter to step three it meant that "the union is taking the position in Crosson's case that there was no proper cause for termination[.]" Id. at 62.

on the ground[.]" James Allen Dep. Tr., Ex. Y to U.S. Steel Mot., at 72 (Dkt. 42-26). On April 27, 2017, Mapp sent Crosson a letter informing him that United Steel Local 1299 would not be pursuing his claim to arbitration. Throughout the grievance process, however, Local 1299 tried to persuade U.S. Steel that lesser discipline, such as suspension and transfer to a less safety-sensitive position, would be sufficient. Allen Decl., Ex. 16 to Union Mot., ¶ 5 (Dkt. 41-17).

Crosson filed the instant complaint against Defendants on July 21, 2017, alleging a "hybrid § 301" claim against Defendants. Crosson alleges that the Union breached the duty of fair representation owed to him under the Labor Management Relations Act, 29 U.S.C. § 151 et seq., and that U.S. Steel breached the collective bargaining agreement.[3]

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing

---

[3] Crosson had also alleged that U.S. Steel retaliated against him for seeking worker's compensation benefits, in violation of the Workers' Disability Compensation Act of 1969, Mich. Comp. Laws § 418.301(13). Compl. ¶¶ 47-55. The Court found that this claim was barred by the statute of limitations and dismissed it. See 6/29/2018 Op. & Order (Dkt. 50).

a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

### III. ANALYSIS

Crosson brings a hybrid § 301 claim, which is "the consolidation of two separate but interdependent actions: one against the employer for breach of the collective-bargaining agreement and one against the union for breach of the duty of fair representation." Robinson v. Central Brass Mfg. Co., 987 F.2d 1235, 1238-1239 (6th Cir. 1993). "To prevail under any claim, the employee must show both that the employer discharged him in violation of the collective-bargaining agreement and that the union breached its duty of fair representation during the grievance process. Therefore, the two claims are often combined in a single lawsuit and referred to as a hybrid § 301/fair representation claim." Id. at 1239 (emphasis in original). If a plaintiff fails to demonstrate both violations, he cannot succeed against the union or the employer, and his hybrid § 301 claim will be dismissed. See White v. Detroit Edison Co., 472 F.3d 420, 425 (6th Cir. 2006) ("White's arguments as to the wrongfulness of his termination, however meritorious, simply are not availing if he cannot first show a breach of the union's duty of fair representation.").

The Court turns first to Crosson's claim against the Union – that it breached the duty of

6

fair representation owed to Crosson. "In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." Garrison v. Cassens Transport Co., 334 F.3d 528, 538 (6th Cir. 2003) (citing Vaca v. Sipes, 386 U.S. 171, 190 (1967)). Here, Crosson relies on the first method, arguing that the Union acted arbitrarily. A union's actions are only arbitrary if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Id. (quoting Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)); see also Marquez v. Screen Actors Guild, 525 U.S. 33, 45-46 (1998) (a union has "room to make discretionary decisions . . . even if those judgments are ultimately wrong. . . . A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation.").

Crosson argues that the Union acted arbitrarily by refusing to arbitrate his claim. Pl. Resp. to Union Mot. at 12 (Dkt. 43). Although he admits that he made an error, he stresses that there was no actual damage caused. Id. at 14. He contends that the Union cannot refuse to appeal a grievance that it believes has merit "simply because the employer maintained that its action was permissible under the collective bargaining agreement," citing Linton v. United Parcel Service, 15 F.3d 1365, 1371-1372 (6th Cir. 1994).

In Linton, the plaintiff was terminated for "dishonesty" in intentionally falsifying a job application by saying that he had never been convicted of a crime when, in fact, he had technically been convicted of a crime. The Sixth Circuit, in reversing the district court's judgment in favor of the union, observed that "the union acknowledged the merit of the grievance but made an affirmative decision not to pursue it because in the past, it had not

7

succeeded on these appeals." 15 F.3d at 1372.

Here, however, the Union believed that Crosson's claim was without merit. See 4/27/2017 Letter, Ex. 10 to Union Mot. (Dkt. 41-11) ("Therefore due to the lack of merit, the Union will not pursue your grievance to arbitration."). James Allen, president of Local 1299, declared that he met with Warren and Mapp after U.S. Steel's third-step response, and Allen made the judgment that arbitration was not warranted. Allen Decl. ¶ 11 (Dkt. 41-17). Warren and Mapp agreed with Allen's assessment. Id. Allen considered a number of factors when determining whether to pursue Crosson's claim, including the fact that Crosson admitted that he violated safety procedures, and his mistake had the potential to cause catastrophic consequences, including fatalities. Id. ¶¶ 12-13. Allen determined that the Board would have upheld the discharge, based primarily on his reading of the "2012 award," a 2012 arbitration decision where the Board stated that a grievant's conduct warranted dismissal due to "substantial economic loss" and, "more importantly,' the "potential to cause serious injury." Id. ¶ 24. Thus, the Union agreed with U.S. Steel that Crosson's case was meritless; it is not as Crosson argues that the Union thought Crosson's claim had merit but simply did not want to challenge U.S. Steel's decision that it had proper cause for termination. "Unions are not . . . obligated to prosecute grievances that they find to be meritless." Kelsey v. FormTech Indus., 305 F. App'x 266, 269 (6th Cir. 2008). Nor is this a case where the union simply accepted the employer's version of the facts without further investigation. Cf. Schoonover v. Consol. Freightways Corp. of Delaware Local 24, 147 F.3d 492, 495 (6th Cir. 1998) (upholding jury finding that union breached duty of fair representation where "the union never confirmed the company's version of events").

Crosson also argues that arbitration could have resulted in the modification of discipline, because there were several mitigating factors that could have been presented. Pl. Resp. at 15-16.

Those factors are: (1) Crosson's seniority, having been a U.S. Steel employee for 17 years; (2) a lack of work-related discipline (Crosson notes that Local 1299 took a grievance to arbitration when the employee was on a "Last Chance Agreement"); (3) Crosson's immediate correction of his mistake, which meant that no property damage or loss of production occurred; and (4) Local 1299 has taken cases with far more serious misconduct to arbitration. Id. at 16-17. He maintains that he had a strong argument that his termination was disproportionate.

The Union points to Walters v. Local Union No. 337, 7 F. Supp. 2d 885, 892 (E.D. Mich. 1998), where the court found that the union did not act arbitrarily when it refused to take the employees' cases to arbitration, rejecting the employees' arguments that "an arbitrator might have found that discharging plaintiffs for taking the duffel bags was an unduly harsh measure and therefore ordered reinstatement and a lesser sanction, such as suspension." The court agreed that arbitrators sometimes reduce discharge penalties, but said that "it does not follow that the Union must seek such lesser penalties via arbitration in order to avoid liability for breach of the duty of fair representation." Id. (emphasis in original). Crosson attempts to distinguish this case by saying that these employees engaged in serious misconduct, while his conduct was "not . . . remotely similar." Pl. Resp. at 14-15. However, the Union here, like the union in Walters, found that Crosson was guilty of the misconduct charged, and "the Union is under no legal obligation to take a case to arbitration to seek mitigation once it concludes that a grievant is guilty of serious misconduct." Walters, 7 F. Supp. 2d at 892.

The parties both rely on various decisions from the Arbitration Board in making their arguments. Crosson notes that the Union took other grievances to arbitration when the circumstances were arguably worse than in his own case. Pl. Resp. to Union Mot. at 9. Among others, he points out a case from 2008, USS-45,434, where the employee caused a company loss

of $10.4 million, Ex. E to Pl. Resp. to Union Mot. (Dkt. 43-6); a 2016 case, USS-48,071, USS-48,072, where an employee caused "thousands of dollars" in damages and had "less than twenty months of service and had previously received discipline for unsatisfactory work," Ex. F to Pl. Resp. to Union Mot. at 6 (Dkt. 43-7); and another 2016 decision, USS-48,188, where the Union arbitrated the case of an employee who was inattentive and caused a spill of hot metal, resulting in thousands of dollars in product damage and $220,000 of loss in production, Ex. G to Pl. Resp. to Union Mot. (Dkt. 43-8). Yet in each of these cases, the Board upheld the employee's discharge.[4]

The Union cites to a 2012 arbitration decision where the Board found proper cause to discharge an employee "for his deliberate misconduct which resulted in substantial economic loss and, more importantly, which had the potential to cause serious injury to Grievant and/or other personnel in the area." Bd. Op., USS-47,362, Ex. 15 to Union Mot., at 10 (Dkt. 41-16). U.S. Steel, in its motion, cites a 2005 arbitration case involving U.S. Steel and a different union (Local 1014); there, the Board stated that it "has upheld terminations in many contexts because of carelessness in the performance of duties and a failure to follow Safe Job Procedures. . . . The risk or potential for personal injury or property damage may be sufficient, regardless of whether an accident actually results." Bd. Op. USS-44,572, USS-44,573, Ex. T to U.S. Steel Mot., at 3

---

[4] Crosson does point to one case where the Board rescinded the employee's discharge and imposed a five-day suspension instead. USS-48,129, USS-48,130, Ex. H to Pl. Resp. to Union Mot. (Dkt. 43-9). However, in that case, the employee was discharged for failure to take a drug test and for failing to comply with a directive from plant security. The only basis for believing that the employee was using drugs was an anonymous tip from a co-employee and the fact that the employee had been placed on a last change agreement after a positive drug test six years earlier. Id. at 7. The Board concluded that the employer did not have a reasonable basis to order the drug test, and therefore did not have proper cause to discharge the employee for refusing to take the drug test. Id. at 7, 10. The case did not primarily concern safety risks or property damage, other than a statement by Hickey that she was concerned about safety issues when employees use drugs, and it has little relevance here.

(Dkt. 42-21).

Neither party points to a case where the Board considered a grievance regarding discharge where there was a serious <u>risk</u> of injury or damage, yet no actual damage was done. It is true that in the decisions cited by the parties, an employee who was discharged caused actual damage to property; however, as Defendants point out, the Board has also suggested that the possibility of harm alone may be sufficient. <u>See</u> Bd. Op. USS-47,362 at 10 (noting that the "more important[]" basis for discharge was the grievant's "potential to cause serious injury"). Given the Supreme Court's admonishment that the court's review of union action must be "highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities," <u>Air Line Pilots Ass'n, Inc. v O'Neill</u>, 499 U.S. 65, 78 (1991), the Court cannot say that the Union's decision was arbitrary and therefore a violation of the duty of fair representation. A union's actions are only arbitrary if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." <u>Garrison v. Cassens Transport Co.</u>, 334 F.3d 528, 538 (6th Cir. 2003). The Union reasoned that Crosson's unsafe actions were potentially catastrophic, and that U.S. Steel had proper cause for termination.

Because Crosson cannot show that the Union breached its duty of fair representation, he cannot prevail against either the Union or U.S. Steel. <u>See, e.g.</u>, <u>Lucas v. Leaseway Multi Transportation Serv., Inc.</u>, 738 F. Supp. 214, 220 (E.D. Mich. 1990), <u>aff'd</u>, 929 F.2d 701 (6th Cir. 1991) ("Since plaintiff's count as to the duty of fair representation fails, plaintiff's other count alleging a breach of the CBA also must fail."). Accordingly, the Court grants both motions for summary judgment.

## IV. CONCLUSION

For the reasons provided, Defendants International Union and United Steel Local 1299's and Defendant United States Steel Corporation's motions for summary judgment (Dkts. 41 & 42) are granted.

SO ORDERED.

Dated: February 6, 2019                       s/Mark A. Goldsmith
Detroit, Michigan                             MARK A. GOLDSMITH
                                                 United States District Judge